# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
### 5:06cv76

| | | |
|---|---|---|
| PATRICIA E. SHOOK, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM** |
| | ) | **OF DECISION** |
| MARK WILLIAM SHOOK, individually | ) | |
| and in his official capacity as Sheriff of | ) | |
| Watauga County; WATAUGA COUNTY; | ) | |
| WATAUGA COUNTY SHERIFF'S | ) | |
| DEPARTMENT; and WESTERN SURETY | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court in accordance with 28, United States Code, Section 636(c), and on defendant Mark William Shook's and defendant Western Surety Company's (hereinafter "Defendant Shook's") Motion for Summary Judgment (#35) and defendant Watauga County's (hereinafter "the County's") Motion for Summary Judgment (#37). Defendants have, collectively, filed a Motion to Strike (#60) portions of plaintiff's affidavit that was tendered in response to defendants' respective motions and briefs. Having carefully considered those motions, plaintiff's response, and all the admissible evidentiary material submitted, the court enters the following findings, conclusions, and Order granting defendants' motions.

–1–

# FINDINGS AND CONCLUSIONS

## I.    Background

This action is an employment dispute wherein plaintiff contends that her job was terminated due to her gender and that defendants created a hostile, sexually charged work environment that was intolerable.  Because plaintiff was employed by a county sheriff, plaintiff has also asserted her employment discrimination claims in the form of a civil rights violation under 42, United States Code, Section 1983. Plaintiff has also asserted a number of supplemental state law claims in her Amended Complaint. Discovery has now closed and defendants have moved for summary judgment on all claims.

## II.    Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial.  Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*."  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material

and readily identifiable by the substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. <u>Anderson</u>, <u>supra</u>. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." <u>Id</u>. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." <u>Id</u>. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. <u>Cole v. Cole</u>, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of defendants' Motions for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. <u>United States ex rel. Jones v. Rundle</u>, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. <u>Davis v. Zahradnick</u>, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. <u>Anderson</u>, <u>supra</u>, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Id.</u>, at 252.

### III.    Procedural History

#### A.    Administrative Proceedings

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") on August 19, 2005, naming as her employer the Watauga County Sheriff's Office, Defendant Shook's Exhibit 1, and then filed an Amended Charge of Discrimination on March 3, 2006, naming as her employer the "Watauga County Sheriff's Office & Mark Shook, Sheriff." Defendant Shook's Exhibit 2. The EEOC issued a Notice of Right to Sue letter on April 18, 2006. Defendant Shook's Exhibit 3.

#### B.    The Original Complaint

On June 23, 2006, plaintiff filed this action against Mark William Shook in both his official capacity as Sheriff of Watauga County and in his individual capacity, also naming as defendants Watauga County and "John Doe Surety." Plaintiff alleged claims of  harassment, retaliation, and discrimination under Title VII of the *Civil Rights Act of 1964*, 42, United States Code, Sections 2000e, *et seq.*, on the basis of her gender.  Plaintiff also asserted a claim pursuant to Section 1983, alleging that her constitutional rights under the fourteenth amendment to the United States Constitution were violated by defendant Sheriff Shook.  Plaintiff further asserted that she was wrongfully terminated on the basis of her gender in violation of Chapter 143-422.2 of the North Carolina General Statutes.  Plaintiff also asserted state law tort claims against the defendants for intentional and negligent infliction of emotional distress.

### C. The Amended Complaint

With leave of this court, plaintiff filed an Amended Complaint on December 12, 2006, naming as an additional defendant Western Surety Company, which was Defendant Shook's surety on his official bond posted in accordance with Chapter 162-8. Despite being allowed to amend her Complaint to bring in the sheriff's surety, plaintiff has failed to assert a claim on his official bond pursuant to N.C. Gen. Stat. § 58-76-5.

In what the court finds to be a scrivener's error, plaintiff also named the "Watauga County Sheriff's Department" as a defendant in the caption of the Amended Complaint, which will be dismissed outright inasmuch as such named defendant is not a person or entity capable of suing or being sued as a matter of well settled law. Hughes v. Bedsole, 913 F.Supp. 420, 426 (E.D.N.C. 1994). The substantive allegations and claims of the original Complaint were not altered, except to add negligent supervision and retention claim against Watauga County.

### D. Answer and Answers to the Amended Complaint

Defendants timely filed both an Answer to the Complaint and Answers to the Amended Complaint, denying the material allegations of the Complaint and asserting affirmative defenses.

## IV. Factual Background

### A. Plaintiff's Work for Former Sheriff James Lyons

In October 1985, plaintiff was hired as a dispatcher by then Sheriff James Lyons. Plaintiff's Depo., at pp. 15, 32. Plaintiff was reappointed to her position each

time Sheriff Lyons was re-elected. Ultimately, Sheriff Lyons promoted plaintiff to the position of Sergeant of Communications (later called Chief of Communications) in 1998. Plaintiff's Depo., at pp. 49-50.

### B. Plaintiff's Work for Sheriff Shook

When Defendant Shook took office in December 2002, he also reappointed plaintiff as Chief of Communications. It is undisputed that plaintiff was an employee-at-will. Plaintiff's Depo., at pp. 33-39. While facts are typically construed in a light most favorable to the party resisting summary judgment, in the context of employment discrimination claims the issue of whether plaintiff was performing her work in a satisfactory manner as well as the perception of decision makers is viewed from the perspective of the decision makers and not that of the plaintiff. As held by the Court of Appeals for the Fourth Circuit,

> Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision. Because the employer has discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria.

Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960 (4th Cir. 1996)(citations omitted).

While plaintiff has attempted to present evidence to the contrary through her own affidavit and arguments construing the testimony of third parties, defendants have presented the court with the only competent evidence on the perceptions of the decision makers.

It is undisputed that plaintiff had, in years past, received positive evaluations

for her job performance. During the last several years and months of her employment, plaintiff was perceived by many of her co-workers and supervisors as having a very poor attitude at work. She was perceived as being very rude, hateful and uncooperative to almost everyone. <u>See</u> Fletcher Decl., at ¶ 5; Harmon Decl.,at ¶ 6; Dishman Decl., at ¶ 5; Tolbert Depo., at pp.100-101. Defendant Shook Depo., at pp.122-126, 128, excerpts from which are attached at Exhibit 9). Plaintiff would have loud arguments with her husband over the telephone while at the office and would frequently make comments about killing her husband, making those around her very uncomfortable. Fletcher Decl., at ¶ 11; Harmon Decl., at ¶ 8; Dishman Decl., at ¶ 7; Shook Depo., at pp.181-186. Plaintiff was further perceived by her fellow dispatchers as exhibiting heavy favoritism toward a male dispatcher, David Hill, which upset other dispatchers. Harmon Decl., at ¶ 9; Dishman Decl., at ¶ 6; Defendant Shook Depo., at pp.167-168. Plaintiff often played Solitaire and other games on her computer to the detriment of her official duties, often making others wait until she finished her computer game before she would perform requested tasks. Fletcher Decl., at ¶ 8; Dishman Decl., at ¶ 8; Defendant Shook Depo., at pp. 137-138, 157.

According to defendant, plaintiff was openly disrespectful to Sheriff Shook, derogatorily referring to him as "Shook Men" as a way to insult him and her husband simultaneously. Defendant Shook Depo., pp. 180-81; Harmon Decl., at ¶ 21; Fletcher Decl., at ¶ 11. Plaintiff would call Sheriff Shook names such as "psychotic bastard," "Satan" and "Devil" and would otherwise ridicule him in the presence of other

dispatchers. Harmon Decl., at ¶ 4); Dishman Decl., at ¶ 11.

Like wise, it was perceived by Defendant Shook that plaintiff also called other individuals by derogatory nicknames, such as "Tits" (dispatcher Toni Dishman), "God" (Lieutenant Fletcher), "Puffy" (Deputy David Proffitt), and "Useless as Tits on a Bull" (Chief Deputy Paula Townsend). According to her supervisor, Lieutenant Fletcher, she was ordered to stop this behavior. Fletcher Decl., at ¶ 9; Harmon Decl., at ¶ 5; Dishman Decl., at ¶ 11; Defendant Shook Depo., at pp.174-76. Even plaintiff admitted that she would tell off-color jokes and use profanity. Plaintiff's Depo., at pp. 80-81; Fletcher Decl., at ¶ 5. Plaintiff would also make sexually related comments, such as speculating out loud whether certain male deputies wore "boxers" or "briefs" and discussing what certain male deputies might look like without their clothes on, but was ordered by Lieutenant Fletcher to stop making these comments Fletcher Decl., at ¶ 10; Defendant Shook Depo., at pp.177-179. Defendant Shook also perceived that plaintiff was often very difficult to contact outside of the office, despite her responsibility to be available at all times. Dishman Decl., at ¶ 12; Defendant Shook Depo., at p. 159.

Defendant Shook also perceived that plaintiff was deficient in keeping up with the technological demands of her position as communications chief. Plaintiff failed to become proficient with new technology and communications systems, and according to plaintiff, her ability to repair computers consisted of replacing a mouse and little more. Plaintiff's Depo., at pp. 42-43. As a result, other employees had to perform plaintiff's job duties. Dishman Decl., at ¶ 10; Harmon Decl., at ¶ 10;

Fletcher Decl., at ¶ 7; Defendant Shook Depo., at pp.156-157.

Plaintiff also started openly discussing requesting a demotion. In July 2004, plaintiff first began to discuss voluntarily stepping down from her position as Chief of Communications and becoming a regular dispatcher. Plaintiff expressed that she was "burned out" from her job and that she wanted fewer job responsibilities. Harmon Decl., at ¶ 10; Fletcher Decl., at ¶ 12.

In April 2005, plaintiff complained to Defendant Shook concerning rumors that she was having an affair with a coworker, David Hill.   Harmon Decl., at ¶ 13; Fletcher Decl., at ¶ 13; Defendant Shook Depo., at p. 161. At the same time, another rumor was circulating around the department that dispatcher Toni Dishman was having an affair  with Lieutenant Chris Welch, of which Welch complained to Defendant Shook.  Defendant Shook suspected that plaintiff had started this rumor about Dishman and Welch. Fletcher Decl., at ¶ 13; Harmon Decl., at ¶ 13; Dishman Decl., at ¶ 15; Defendant Shook Depo.,at p. 161. In direct response to the complaints by both the plaintiff and Welch, Defendant Shook and other senior members of management questioned the plaintiff, Melissa Harmon, and dispatcher Toni Dishman separately regarding the rumors. Fletcher Decl., at ¶ 14; Harmon Decl., at ¶ 13; Dishman Decl., at ¶ 16; Plaintiff's Depo., at pp. 67-71; Defendant Shook Depo., at pp. 162-65.  During those interviews, plaintiff denied having any romantic affairs. Ms. Harmon acknowledged that plaintiff had told her that Toni Dishman was having an affair with Lieutenant Welch. Harmon Decl., at ¶ 13; Fletcher, Decl., at ¶ 14; Defendant Shook Decl., Exhibit A (an audiotape, which is attached as Exhibit 11 to

Defendant Shook's brief).

Toni Dishman refused to answer Defendant Shook's questions concerning the identity of the individual who allegedly reported seeing plaintiff's car parked at David Hill's house. Sheriff Shook terminated Toni Dishman for her refusal to obey his directions. Fletcher Decl., at ¶ 14; Defendant Shook Depo., at pp.162-63; Dishman Decl., at ¶ 16. It is undisputed that after the interviews and the firing of Dishman, plaintiff experienced no further problems with any rumors. Plaintiff's Depo., at p. 233.

As she had in July 2004, plaintiff began to talk once again in April 2005 about voluntarily stepping down as the Chief of Communications. Her expressed reason for wanting to do so was that she was "burned out" from her job and that she wanted fewer responsibilities and more time at home; while wanting fewer responsibilities, however, she was steadfast that she would not accept a reduction in her salary. Fletcher Decl., at ¶ 17); Harmon Decl., at ¶ 14.

Despite Defendant Shook putting an end to the rumors of which plaintiff complained, her job performance and attitude at work - - as perceived by Defendant Shook and others in management - - continued to decline. Plaintiff treated a new dispatcher so poorly that the dispatcher requested to be transferred to work at the jail. Fletcher Decl., at ¶ 16; Defendant Shook Depo., at pp.146-47, Ex. 9. Further, plaintiff became openly hostile and defiant to her assistant chief Melissa Harmon. She told Ms. Harmon that she would not help her train any new dispatchers in the future and that she would purposefully try to be a problem employee for Ms. Harmon once

Harmon became Chief of Communications. Harmon Decl., at ¶ 15-16; Defendant Shook Depo., at p. 187.

### C. Plaintiff's Termination

On May 24, 2005, plaintiff took action on her previous comments concerning stepping down as communications chief. On that day, she submitted a letter to Defendant Shook in which she explained why she wanted to step down as Chief of Communications. Plaintiff's Depo., at Ex. 9. When Defendant Shook informed plaintiff that her compensation would have to be reduced as a result of her voluntarily relinquishing her position as Chief of Communications, Townsend Depo., at pp. 343-45, plaintiff was angered. It was plaintiff's position that Defendant Shook could not lower her pay, because in her view her position was simply being "reclassified" under the Watauga County Personnel Ordinance; therefore, it was her contention that her salary could not be reduced despite relinquishing responsibilities which she found to be overburdening. Plaintiff's Depo., at pp. 100-02; Defendant Shook Depo., at pp. 186-88; Geouque Decl., at ¶ 7.

On June 17, 2005, plaintiff participated in a meeting with Defendant Shook, Chief Deputy Paula Townsend, and Assistant Watauga County Manager Deron Geouque. During this meeting, Assistant County Manager Geouque advised plaintiff that her interpretation of the Watauga County Personnel Ordinance regarding her purported reclassification was incorrect. Geouque Decl. ¶ 7; Plaintiff's Depo., at pp. 100-02. Defendant Shook as well as others in attendance at that meeting perceived that plaintiff was both disrespectful and combative toward Defendant Shook and Mr.

Geouque, to the point that Chief Deputy Townsend later commented about plaintiff's attitude. Geouque Decl., at ¶ 7; Plaintiff's Depo., at pp. 101-02; Townsend Depo., at p. 348. In light of plaintiff's behavior at the June 17, 2005, meeting, her deteriorating job performance and her attitude problems, Defendant Shook made the decision to terminate plaintiff's at-will employment. Geouque Decl., at ¶ 10; Defendant Shook Depo., at pp. 182-92, Ex. 6.

On June 20, 2005, plaintiff met again with Defendant Shook, Townsend, and Geouque. Again, plaintiff was combative and disrespectful during this meeting, and at that time Defendant Shook advised plaintiff that her services were no longer required and had Townsend escort her from the premises. Geouque Decl., at ¶ 10. Immediately thereafter, Defendant Shook promoted Melissa Harmon to replace plaintiff as Chief of Communications. Harmon Decl., at ¶ 18; Plaintiff's Depo., at p. 112; Defendant Shook Depo., at p. 192.

* * *

In responding to the defendants' motions for summary judgment, the court has been presented an affidavit from plaintiff that is, at times, antithetical to her own deposition testimony and in which she attempts, in part, to spin testimony of others in a manner that is more favorable to her claim. To the extent plaintiff's affidavit and arguments have done so, the affidavit is in part inadmissible and the arguments to such effect are unpersuasive and have not been considered. The Motion to Strike is granted.

**V.    Discussion**

**A.    Plaintiff's Title VII Claims for Hostile Work Environment and Sexual Harassment**

This claim arises under Title VII of the Civil Rights Act of 1964, as amended-- 42, United States Code, Sections 2000e, et seq. Plaintiff claims that she was sexually harassed by coworkers and was constructively discharged from her employment with defendant. She timely filed a charge of discrimination with the Equal Employment Opportunity Commission. This court has jurisdiction over plaintiff's claims of sexual harassment and hostile work environment. 28 U.S.C. § 1343; 42 U.S.C. § 2000e(5)(f)(3).

Title VII has created two recognized causes of action--*quid-pro-quo* harassment and hostile work environment claims. The respective burdens in the two types of sexual harassment claims may be met with direct evidence, introduction of statements, or circumstantial evidence which is relevant and probative. Moore v. City of Charlotte, 754 F.2d 1100 (4th Cir.), cert. denied, 472 U.S. 1021 (1985).

*Quid-pro-quo* harassment is defined as "harassment in which a supervisor demands sexual consideration in exchange for job benefits," Katz v. Dole, 709 F.2d 251, 254 (4th Cir. 1983), see also Spencer v. General Electric Co., 894 F.2d 651, 658 (4th Cir. 1990); and consists of conditioning employment benefits on the employee's submitting to the sexual advances or threatening adverse employment actions if the employee does not submit, see Tomkins v. Public Serv. Elec. & Gas Co., 568 F.2d 1044 (3d Cir. 1977). "Benefits" may include the taking of adverse employment action

-13-

against an employee who refuses to submit to the supervisor's sexual advances. Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554 (11th Cir. 1987). In this case, there is absolutely no evidence that anyone conditioned any employment benefit or threatened to terminate plaintiff's employment at the sheriff's office if she did not submit to sexual advances. Plaintiff admitted as much in her deposition. Plaintiff's Depo., at 121.

Plaintiff also contends that defendants created a hostile work environment in violation of Title VII. Plaintiff has made 16 allegations of incidents which she believes gives rise to her Title VII claim, which the court has summarized as follows:

(1)    in 2002, Defendant Shook assigned Deputy Randall Townsend to road duty, which plaintiff admitted in her deposition that was within the discretion of any sheriff and had nothing to do with plaintiff's gender, Plaintiff's Depo., at pp. 174-75;

(2)    in spring 2003, despite criticism leveled by plaintiff, Defendant Shook gave preferential treatment given to another employee, Ed Gigolo, because he was a friend of Defendant Shook, which plaintiff admits had nothing to do with her gender, Plaintiff Depo., at pp. 98-100;

(3)    in 2003, Defendant Shook yelled at dispatcher Toni Dishman because he was angry at Lieutenant Joe Moody, for which plaintiff testified he soon apologized to Ms. Dishman, Plaintiff's Depo., pp. at 146-48;

(4)    in 2003 or 2004, Defendant Shook became angry when he could not locate Chief Deputy Paula Townsend during a crisis, and allegedly said in plaintiff's presence that Townsend was "probably down the mountains spreading her legs for that fellow." Plaintiff admits that she did not tell Defendant Shook that this comment offended her and she admitted that such comment was not directed at her, Plaintiff's Depo., at pp. 61-64;

(5)    in 2003, plaintiff claims Defendant Shook made two comments to her in private in 2003 about dispatcher Toni Dishman of a sexual nature. First,

that Ms. Dishman "shouldn't advertise it in the store if she didn't want people to come shopping" and second, that "it's too bad her brain isn't as big as her tits." Plaintiff states that Defendant Shook made these alleged comments only to her, Plaintiff's Depo., at 60, and that she never told Defendant Shook that she felt offended by these alleged comments about Ms. Dishman, a person whom plaintiff habitually called "Tits," Plaintiff's Depo., at 61; Harmon Decl., at ¶ 5); Dishman Decl., at ¶ 11;

(6)     in the Spring of 2004, Defendant Shook granted dispatcher Irene Webb's request for sick leave after purportedly telling plaintiff to deny Ms. Webb's request, Plaintiff's Depo., pp. 185-187;

(7)     also, plaintiff claims that Defendant Shook called Ms. Webb into his office one day to talk. Irene Webb told plaintiff that Sheriff Shook had asked her how she was doing and if there was anything that he could do to help her, Plaintiff's Depo., at pp. 187-88;

(8)     in the Summer of 2004, she was told by Melissa Harmon that Defendant Shook had made a comment to Ms. Harmon in private (plaintiff was not present) that plaintiff "would be better off if she got rid of her husband," Plaintiff's Depo., at pp. 224-26;

(9)     in Spring 2004, Defendant Shook allowed an individual who was not yet 21 years old to work as a dispatcher at the Sheriff's Office. Plaintiff admits that this allegation has nothing with her or her gender, Plaintiff's Depo., at pp. 155-56, 223-24;

(10)    in January 2005, Defendant Shook praised a female dispatcher in front of others for working overtime during an Amber Alert crisis, but that he criticized the plaintiff in connection with information being leaked to the media during the crisis, Plaintiff's Depo., at pp. 155-58, 228-29;

(11)    in January 2005, plaintiff claims that she was discriminated against because Lieutenant Jamey Fletcher, a male, was appointed to be her immediate supervisor.  Plaintiff admits, however, that Lieutenant Fletcher had superior knowledge and expertise with regard to communications equipment and that he was appointed to this position in order to deal with vendors, architects and contractors in connection with the construction of the new Watauga County Sheriff's Office, Detention Center and Communications Center, Plaintiff's Depo., at pp. 44-45; Harmon Decl., at ¶¶ 10-12; Defendant Shook Depo., at pp. 92-93; Fletcher Decl., at ¶ 3;

(12)    in March 2005, she was the subject of rumors and office gossip around

the Communications Office (discussed more completely <u>supra</u>) that she having romantic affairs with other people. Plaintiff admits that Defendant Shook did not create or spread any of these rumors. She further admits that after she complained to Defendant Shook about the rumors, he told her that he would act to put an end to them, and it is clear from the evidence that he in fact did, fire an employee, and the rumors ended. Plaintiff has, however, found fault in Defendant Shook's handling of such situation, ascribing discriminatory animus to his allegedly laughing about the absurdity of such a proposition, because, in plaintiff's words, Deputy Proffitt was a "very large, very, very shy, very young, obviously not an overly attractive individual." Defendant Shook then asked plaintiff if she was having an affair with dispatcher David Hill, which she denied. Plaintiff's Depo., at pp. 69-72. She acknowledged that after this interview, Defendant Shook never questioned her again about any rumors. Plaintiff's Depo., at pp. 232-233.

Plaintiff further claims that Defendant Shook had asked her four or five times over the course of the four or five months prior to the March 2005 interview about the truth of other rumors that she was having romantic affairs with certain deputies. According to plaintiff, no one else was present when he allegedly asked her these questions. Plaintiff's Depo., at pp. 57, 76). Plaintiff claims that these previous occasions were similar to the manner in which Defendant Shook had asked her about the rumors during the closed door interview in March 2005. Plaintiff's Depo., at pp. 110, 120. Plaintiff testified that it is her opinion that Defendant Shook intended to embarrass her by asking her these questions, rather than attempting to put an end to the rumors. Plaintiff's Depo., at pp. 76-77). However, plaintiff admits that she never told Defendant Shook that she was offended by his asking her about the truth of such rumors. Plaintiff claims that following her March 2005 interview by the senior leadership, she told Lieutenant Fletcher that she felt that what had gone on during the interview was "wrong." She admits that she said nothing further to Lieutenant Fletcher and that she did not ask him to take any action. Plaintiff's Depo., at p. 74.

Plaintiff contends that several days after the March 2005 interview, she decided to step down as Chief of Communications and assume the position of a regular dispatcher because she was tired of being asked whether she was sleeping with anyone. Plaintiff further contends that she told Lieutenant Fletcher that she was tired of being asked if she was sleeping with anyone, but did not ask him to do anything. Plaintiff's Depo., at pp. 75-76. Plaintiff admits that she never told Defendant Shook that she wanted to step down from the position of Chief of Communications because she was tired of being asked about the rumors surrounding her. Indeed, plaintiff admits that the last time

she was aware of any rumors about her was in March 2005. Instead, plaintiff provided Defendant Shook with a letter on May 24, 2005 in which she explained that she was tired of the long hours and extra duties associated with the job of Chief of Communications and that she wanted to spend more time with her children. Plaintiff's Depo., at Ex. 9.

(13)    in the Spring of 2005, Defendant Shook engaged in conversation with her about dispatcher Sharon Keller, asking plaintiff "how's the rip doing?" Plaintiff's Depo., at pp. 65-67; Defendant Shook's dep., pp. 197-199.Plaintiff never told Defendant Shook that she felt offended by this comment, Plaintiff's Depo., at p. 67;

(14)    in June 2005, Defendant Shook made a comment to her about a new female dispatcher to the effect of "he would have to get a chastity belt for her because all the deputies would want to fuck her." Plaintiff testified that only she and Defendant Shook were present when he purportedly made this comment. Plaintiff never told Sheriff Shook that she felt offended by this purported comment, Plaintiff's Depo., at p. 64;

(15)    from December 2002 to June 2005, Defendant Shook would frequently called her "hon" or "honey." Plaintiff does not contend that Defendant Shook meant to demean or insult her by his use of this term. Plaintiff never told Defendant Shook that she did not like for him to call her "hon" or "honey" and never asked him to stop doing so, Plaintiff's Depo., at p. 81-82; and

(16)    finally, plaintiff claims that Defendant Shook occasionally told off-color jokes. Plaintiff's Depo., at pp. 79-81. Plaintiff cannot remember the substance of any of these jokes, other than that some of them may have been about blondes. Plaintiff's Depo., at p. 115. Plaintiff also cannot remember when, where, or to whom any of these jokes were allegedly told. Plaintiff wrote in her EEOC paperwork that these purported jokes were told "a couple of times a month." Plaintiff's Depo., at p. 218. Plaintiff admits that she would also tell off-color jokes, as would others. Plaintiff never told Defendant Shook that she was ever offended by any of his comments or jokes, Plaintiff's Depo., at pp. 79-81.

* * *

To survive a motion for summary judgment on a Title VII hostile work environment claim, a plaintiff must present evidence upon which a jury could reasonably find that

(1)     she experienced unwelcome harassment;

(2)     the harassment was based on her gender or sex;

(3)     the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and

(4)     there is some basis for imposing liability on the employer.

Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003).

What is readily apparent from all of the evidence submitted is that plaintiff well knew of an effective mechanism for reporting unwelcome conduct in the workplace when she complained to Defendant Shook concerning rumors that she was having an affair.  While plaintiff clearly now contends a litany of alleged decisions, conduct, and comments were offensive to her, she admits that she never complained to Defendant Shook when she disagreed with his decisions, found his jokes offensive, or  found that his workplace comments made the conditions of her work intolerable. Indeed, when she asked to be demoted from chief of communications, she indicated to Defendant Shook that such was to reduce stress and allow her more time to spend with her children - - something she had been contemplating and discussing within the office for nearly a year.

In determining whether there was a hostile or abusive work environment, the court looks to the totality of the circumstances.  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).  In making such a determination, the Supreme Court requires courts to consider

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

> whether it unreasonably interferes with an employee's work performance.

Harris v. Forklift Sys., Inc., supra, at 23. Indeed, plaintiff's own testimony is that she was never personally targeted by sexually derogatory or gender disparaging remarks, conduct that threatened or humiliated her physically (to wit touching or requests for sexual favors), or that any such alleged conduct interfered with the performance of her duties. Despite plaintiff's conclusory allegations that Defendant Shook's comments, jokes, and employment decisions interfered with her ability to do her job, there is no admissible evidence to back up that theory. Indeed, plaintiff's own statements in the workplace as well as her letter requesting a demotion indicated that she wanted less stress by reducing job responsibilities and to spend more time at home. Applying all of these factors, it is readily apparent that plaintiff was never personally the object of sexual or gender slurs, and that sexual or gender bias, if any, in no way interfered with the quality of her work, the environment of the workplace, or the circumstances of her employment.

The appellate court in Hartsell pointed out that the misconduct must render the workplace *objectively* hostile, not subjectively. The court has searched plaintiff's evidence and, while finding that while plaintiff may have subjectively believed she was treated differently due to her gender or that the workplace was sexually charged (even though her own testimony infers that she did not even have a subjective belief), the undersigned can find no objective evidence - - either circumstantial or direct - - that the alleged comments or other conduct of Defendant Shook or other persons manifested itself in adverse conditions of plaintiff's employment. Even taking

plaintiff's most serious allegation, that Defendant Shook repeatedly asked her if the rumors of affairs with other officers were true, does not support a hostile work environment claim. It is undisputed that when plaintiff brought such rumors to Defendant Shook's attention, he took prompt remedial action which put an end to rumors and resulted in the dismissal of an employee who was apparently involved in spreading a false rumor concerning plaintiff.

Indeed, it would appear from a review of all the evidence that if the workplace was charged with crude jokes and off-color humor, plaintiff herself admittedly contributed to it in full measure. While comments disparaging the virtue of fellow employees and the use of patently offensive vulgarities have no place in a professional workplace and reflect an archaic, insensitive, and crude attitude, there is no evidence that they affected any term or condition of plaintiff's employment. It appears that such comments had no objective impact on plaintiff's day-to-day employment and plaintiff has not satisfied her burden of coming forward with evidence upon which a reasonable finder of fact could determine that her workplace was charged with sexual or gender based discrimination so as to make it objectively abusive. See Smith v. First Union Natl. Bank, 202 F.3d 234 (4th Cir. 2000). Title VII simply does not guarantee a workplace free from crude remarks, insensitive coworkers and supervisors, inconsistent decision making by superiors, and rumors and all that comes with such a spiteful practice.

As to each element, plaintiff's Title VII suffers fatal flaws. As to the first element, i.e. that she experienced unwelcome harassment, there is absolutely no

evidence that plaintiff ever complained to Defendant Shook of the conduct she found offensive. Indeed, the overwhelming evidence is that plaintiff contributed her share to the general low-brow humor and derogation of others based on sexual attributes. Plaintiff has also not presented evidence on the second element, i.e., that she was harassed based on her gender or harassed sexually. Finally, based on a totality of the admissible evidence that has been presented, the plaintiff has not shown that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere.

The court has searched plaintiff's evidence as well as her 16 contentions of wrongdoing and while finding that plaintiff subjectively believed she was treated differently due to her gender or that she was subjected to a sexually charged workplace, the undersigned can find no objective evidence that would support her contentions. Because the "conduct must be extreme to amount to a change in the terms and conditions of employment," Faragher, supra, at 788, simple teasing, sporadic use of abusive language, off-hand comments, gender-related jokes, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Id. "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir.), cert. denied, 117 S. Ct. 70 (1996). Rather, its purpose is to protect a "reasonable person" from an environment in which abuse is sufficiently severe or pervasive as to alter the conditions of his or her employment. Id. at 753 (citing Harris v. Forklift Sys., Inc.,

supra, at 19 (1993) and <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).

Title VII is, perhaps, the most important legislation of the past century, for it attempts to level the workplace playing field by creating an action for unlawful and reprehensible prejudice. It does not, however, guarantee any employee - - male or female, black or white - - that they will have a pleasant and civil workplace. This court has no jurisdiction over unpleasantries and incivility unless their objective origin or result is unlawful discrimination. Summary judgment will be granted in favor of defendants and against plaintiff on her Title VII claims.

**B.    Plaintiff's Title VII Claim for Wrongful Termination and Retaliation Based on Gender**

Plaintiff also contends that she was improperly terminated based on her gender and that Defendant Shook improperly retaliated against her for "making mistakes" in quoting her the amount her salary would be reduced when she stepped down from being communications chief.

As a matter of law, plaintiff has failed to either state or support a claim for retaliation under Title VII, inasmuch as the retaliation clause is not a catch basin for claims, but requires specific allegations and supporting evidence that an employer retaliated against an employee for exercising rights protected by Title VII.

As to plaintiff's Title VII wrongful discharge claim, defendants have moved for summary judgment, contending that plaintiff cannot present evidence of a *prima facie* case of gender discrimination. Plaintiff objects and argues that summary judgment is inappropriate, inasmuch as she avers that defendant impermissibly fired

her because she is a woman. Plaintiff has a particularly difficult task inasmuch as the person who hired her also fired her, and because she was immediately replaced by another woman.

A plaintiff may establish a case of gender discrimination through direct evidence of discrimination or through the cumulative effect of indirect evidence of the employer's motivation. Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 240 (4th Cir. 1982). Alternatively, a plaintiff may attempt to establish a *prima facie* case of gender discrimination through use of a "McDonnell-Douglas scheme." Id.

If a plaintiff can establish such a *prima facie* case, the burden shifts to the employer to show some legitimate, nondiscriminatory reason for the employment action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). In this case, Defendant Shook has shown that he fired plaintiff because plaintiff was not meeting his reasonable expectations and her behavior had become unacceptable. Defendant Shook's Brief in Support, at 19. Upon such a showing, the burden shifts back, and the employee has the burden of proof to show by a preponderance of the evidence that the legitimate reasons offered by the employer were not true reasons, but were pretext for gender discrimination. Id. In the instant matter, plaintiff contends that she has established a *prima facie* case, that the reasons given by Defendant Shook are pretextual because

> None of the aforementioned reasons for the plaintiff's termination can be believed because they were articulated only after the filing of this lawsuit. Moreover, the plaintiff was never reprimanded and received high job performance evaluations. Shook's allegations therefore suggest a suspicion of mendacity.
> Finally, although a female replaced the plaintiff after her

termination, it was only because she was next in line for the position. Notwithstanding, the evidence of sexual harassment and hostile work environment is sufficient to show animus based on gender discrimination. Based on the foregoing, we contend that the plaintiff has produced evidence sufficient to withstand the Defendants' motion for summary judgment on this claim.

Plaintiff's Response, at 23.

Plaintiff argues that Defendant Shook's given legitimate, nondiscriminatory reasons should not be credited because he failed to articulate his reasons for firing her at the time fly in the face of the evidence presented. From the evidence now before the court, Defendant Shook undoubtedly perceived that plaintiff was not performing her function as Chief of Communications inasmuch as certain job duties were not being accomplished by her, and he perceived that she was insubordinate in the June 17, 2005, meeting. Plaintiff then repeated such performance on June 20, 2005, when plaintiff again met with Defendant Shook, Townsend, and Geouque, and *at that time* Defendant Shook advised plaintiff that her services were no longer required and had Townsend escort her from the premises. Geouque Decl., at ¶ 10. The court can find absolutely no inconsistency between being fired during or soon after a meeting at which the employee was perceived to be insubordinate, and a later argument that the employee was fired for insubordination. This court will not discredit the testimony of an employer who uses tact in diffusing a situation and allows an employee to leave the office with at least some modicum of self esteem by simply saying "you're services are no longer needed." Being an at will employee, plaintiff was not even entitled to that explanation inasmuch as an at-will employee can be lawfully discharged with no reason given. Further, plaintiff's responsive argument finds not

only no support in the admissible evidence presented, it is wholly foreclosed by her own deposition, in which she admitted that she was not terminated for any reason related to her gender.  See Plaintiff's Depo., at pp. 111-12.

While plaintiff dismisses the immediate hiring of another female to replace her as mere happenstance, plaintiff fails to note the legal significance of such decision. It is well settled in the Fourth Circuit that "[i]n order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class."  Brown v. McLean, 159 F.3d 898, 905 (4th Cir. 1998).

Reading all the pleadings in a light most favorable to plaintiff, it appears that she has no direct evidence of gender discrimination; the "mixed-motive" standard under Fuller v. Phipps, 67 F.3d 1137, 1141 (4th Cir. 1995), would be inapplicable; and analysis of this claim as a "pretext" case under the burden-shifting scheme of McDonnell-Douglas v. Green, 411 U.S. 792, 802 (1973), is appropriate. The court will, therefore, grant Defendant Shook's Motion for Summary Judgment as to plaintiff's Title VII wrongful discharge and retaliation claim.

### C.    Plaintiff's Section 1983 Claim for Sex Discrimination

Citing the fourteenth amendment in her Amended Complaint, the court assumes that plaintiff is contending that by allegedly discriminating against her based on her gender, Defendant Shook has, as a state actor, violated her rights under the Equal Protection Clause of the fourteenth amendment to the United States Constitution.  Plaintiff's Section 1983 claim must be established through the same

proof scheme used under Title VII. <u>Abasiekong v. City of Shelby</u>, 744 F.2d 1055, 1058 (4th Cir.1984). As discussed above, plaintiff cannot meet this burden and Defendant Shook is entitled to summary judgment on this claim.[1]

### D.    Plaintiff's State Law Wrongful Termination Claim

It is the express public policy of the State of North Carolina to protect the right of all people to seek, obtain, and hold employment without discrimination. N.C.Gen.Stat. § 143-422.2. Plaintiff contends that her discharge constitutes a violation of that public policy and that North Carolina law provides her with a private cause of action. The Court of Appeals for the Fourth Circuit, in a published decision originating in this district, held, in pertinent part, as follows:

> Neither the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA. Instead, most courts have applied the NCEEPA only to common law wrongful discharge claims or in connection with other specific remedies.
> In *Mullis v. Mechanics & Farmers Bank*, 994 F.Supp. 680 (M.D.N.C. 1997), the court held that "[a]bsent a clear indication from the courts or the legislature of North Carolina that a private right of action does exist under the NCEEPA, it would be inappropriate for a federal court to create a private right of action under the NCEEPA, and this court declines to do so." We agree.

<u>Smith v. First Union National Bank</u>, 202 F.3d 234, 247 (4th Cir. 2000) (citations and footnote omitted); <u>accord</u> <u>McNeil v. Scotland County</u>, 213 F.Supp.2d 559, 570 (M.D.N.C. 2002). In conformity with that decision, the court will grant Defendant Shook's Motion for Summary Judgment as to this claim.

---

[1]    Inasmuch as it appears clear that plaintiff cannot move forward on this claim, the court will not consider whether Defendant Shook is entitled to qualified immunity.

### E.  Plaintiff's Claim for Intentional Infliction of Emotional Distress

Defendant Shook has also moved for summary judgment on plaintiff's state-law claim of intentional infliction of emotional distress.  The elements of the tort are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." Hogan v. Forsyth Country Club, 79 N.C. App. 483, 488, disc. rev. denied, 317 N.C. 334 (1986).  "It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery." Id., at 490.

For purposes of ruling on defendant's motion, the court has resolved any disputed facts in plaintiff's favor.  Even if the court were to consider all 16 incidents, they do not "exceed all bounds of decency," West v. King's Dep't Store, Inc., 365 S.E.2d 621, 625 (N.C. 1988), and cannot be "'regarded as atrocious, and utterly intolerable in a civilized community.'" Wagoner v. Elkin City School Bd. of Educ., 440 S.E.2d 119, 123 (N.C. Ct. App. 1994) (citation omitted).  Plaintiff has testified that the only conduct on the part of Defendant Shook that she contends was "extreme and outrageous" was his allegedly asking her on four or five occasions whether she was "sleeping with so and so" in his efforts to put an end to rumors about her going around the Sheriff's Office. Plaintiff's Depo., at pp. 119-121.  Taking the testimony as true, there simply is no evidence that Defendant Shook asked plaintiff's these questions for an improper or prurient purpose. Indeed, the questioning was followed up by an investigation by Defendant Shook as to who was spreading false rumors.  There are no allegations of any touching, foul language, suggestive remarks, or sexual

advances in Defendant Shook making his inquiry.

As a matter of law, neither the acts alleged by plaintiff nor her resulting emotional distress and physical ailments (if any) rises to a level which would support her claim. In Hogan, wherein a defendant threatened plaintiff with bodily injury and advanced on her with a knife after she refused his sexual advances, the appellate court found that plaintiff had stated a cause of action and that defendant's conduct was "beyond the `bounds usually tolerated by decent society.'" Hogan v. Forsyth Country Club Co., supra, at 491. Plaintiff has not presented evidence that what happened in this case was in any way outrageous and has faltered in showing that her reactions were severe or extreme. In Hogan, that plaintiff presented evidence that she developed ulceration - -a condition evincing emotional distress and having a long-term physical detriment.

The cause of action for intentional infliction of emotional distress is a last resort for calling to task (1) those who engage in primitive and uncivilized behavior in an attempt to impose their prurient will on others or (2) those in positions of authority and responsibility who allow such conduct to occur or continue. If courts were to permit plaintiff's claim to go forward, absent a showing of conduct which exceeded bounds of common decency, the cause of action would be rendered meaningless. Inasmuch as plaintiff cannot meet the standards set forth in Hogan, summary judgment must be entered for Defendant Shook as to plaintiff's claim of

intentional infliction of emotional distress[2].

### F.    Negligent Infliction of Emotional Distress

To assert a claim for negligent infliction of emotional distress under North Carolina law, plaintiff must allege that

(1)    the defendant <u>negligently</u> engaged in conduct;

(2)    it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress or mental anguish; and

(3)    the conduct did in fact cause the plaintiff severe emotional distress.

<u>Pardasani v. Rack Room Shoes. Inc.</u>, 912 F. Supp. 187, 192 (M.D.N.C. 1996).  In this case, the only evidence plaintiff has to support this claim is the same evidence giving rise to her claim for intentional infliction of emotional distress.  <u>See</u> Plaintiff's Depo., at 314-15.  Plaintiff simply has alleged no negligent acts on the part of any defendant and has provided no evidence of any act of negligence.  This manner of pleading and proving *negligent* infliction of emotional distress has long been held to be insufficient:

> [W]e believe the negligent infliction claim should have been dismissed for a more basic reason: Mitchell's complaint does not allege any negligent acts by Lydall.  <u>See</u> <u>Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.</u>, 395 S.E.2d 85, 97 (N.C.1990) ("to state a claim for negligent infliction of emotional distress, a plaintiff must allege that (1) the defendant negligently engaged in conduct, . . .").  Mitchell's complaint contains merely a single, conclusory allegation that

---

[2]    The court will not take up the protections afforded Defendant Shook beyond his bond based on governmental immunity inasmuch as it appears clear that summary judgment is appropriate on this claim.

Lydall was negligent; the material factual allegations charge nothing but intentional acts by Lydall in failing to accommodate Mitchell's MS condition and in discharging him. Taking these material factual allegations as true and construing them in the light most favorable to Mitchell . . . we must conclude that they do not state a claim for negligent infliction of emotional distress.

Mitchell v. Lydall, Inc., 1994 WL 38703, *3 (4th Cir. 1994).[3]  A claim for *negligent* infliction of emotional distress is, therefore, subject to dismissal when "the material factual allegations charge nothing but intentional acts . . . ." Id.

Inasmuch as plaintiff relies solely on the allegations of intentional discrimination, the court will grant Defendant Shook's Motion for summary judgment on this claim.[4]

### G.    Punitive Damages

Defendant Shook has moved for summary judgment on plaintiff's prayer for punitive damages contained in her *ad damnum* clause.  Rule 56(a) appears to be addressed to judgment on claims, not judgment on requests for relief:

A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

Fed.R.Civ.P. 56(a). As a matter of state law, "punitive damages" is not a cause of action, but is instead a remedy available in very limited circumstances.

As a general rule, "[p]unitive damages do not and cannot exist as an

---

[3]    Due to the limits of ECF, a copy of such unpublished opinion is placed in the electronic record through reference to the Westlaw citation.

[4]    The court finds no need to consider public officer immunity inasmuch as it is clear to this court that none of plaintiff's state law tort claims are viable.

> independent cause of action, but are mere incidents of the cause of action and can never constitute a basis for it. If the injured party has no cause of action independent of a supposed right to recover punitive damages, then he has no cause of action at all." J. Stein, Damages and Recovery § 195 at 389 (1972). North Carolina follows this general rule of law.

Hawkins v. Hawkins, 101 N.C.App. 529, 532 (1991). In North Carolina,

> punitive damages may be awarded only if a claimant proves that the defendant is liable for compensatory damages and that the defendant is guilty of fraud, malice, or willful or wonton conduct.

Combs & Associates, Inc. v. Kennedy, 147 N.C.App. 362, 374 (2001) (citation omitted). With none of plaintiff's claims surviving summary judgment, plaintiff's demand for punitive damages likewise fails as it is an "incident of the cause of action." Hawkins, supra. While it is well established that punitive damages cannot be obtained against a governmental entity or against a public employee in their official capacity, Long v. City of Charlotte, 306 N.C. 187, 207-08 (1982), the court declines to consider this as a summary judgment issue, but will, as did the lower court in Long, strike the allegations of the Amended Complaint under Rule 12(f) that seek punitive damages against any municipal entity or any person sued in their official capacity. Id., at 206.

## H. Claims Against Western Surety

While plaintiff named Western Surety in her Amended Complaint, she has asserted no claims against such defendant, including the statutory claim under Chapter 58-76-5 of the North Carolina General Statutes. Finding that there are no claims upon which to grant Defendant Western Surety summary judgment, and further finding that plaintiff cannot prove every element of any tort she has asserted

against Defendant Shook, the court will dismiss Western Surety with prejudice from this action inasmuch as plaintiff has failed to state any cognizable claims against it.

## I.     Claims Against Watauga County

Inasmuch as none of plaintiff's claims are viable against Defendant Shook, they are equally unviable against the County.

To the extent plaintiff has attempted to impose liability on the County for the alleged acts of a sheriff, an elected sheriff is not an agent or employee of a county. Clark v. Burke, 117 N.C.App. 85 (1994). Further, the North Carolina Court of Appeals has specifically found that no tort action will lie against a county by any deputy or employee of a sheriff's office inasmuch as it is the sheriff, and not the county, that is the employer. Peele v. Provident Mutual Life Insurance Company, 90 N.C.App. 447, rev. den., 323 N.C. 366 (1988). This would include plaintiff's claims for negligent infliction of emotional distress, intentional infliction of emotional distress, negligent supervision, and any claim under the NCEEPA (if a private cause of action in fact existed). Plaintiff also failed to name Watauga County in her EEOC charge, a jurisdictional failure in bringing any Title VII claim before this court against Watauga County. Mickel v. South Carolina State Employment Service, 377 F.2d 239 (4th Cir.1967), cert. den., 389 U.S. 877 (1967). Thus, all Title VII claims against the county must also be dismissed for this jurisdictional failure. As to plaintiff's Section 1983 claims, even if Defendant Shook was an employee of the County, plaintiff has failed to allege or present evidence that his allegedly unlawful acts were the result of any policy, custom, or practice of Watauga County. Monell v. New York City Dept.

of Social Services, 436 U.S. 658, 691 (1978).

Summary judgment will be entered in favor of Watauga County in this matter as to all claims over which this court has jurisdiction and all other claims will be dismissed for lack of subject matter jurisdiction.[5]

## VI.    Conclusion

It appearing that no genuine issues of fact remain for trial and that all defendants are entitled to summary judgment or a dismissal on all claims asserted herein, the court will grant each defendant's motion for summary judgment, dismiss all claims over which this court lacks subject matter jurisdiction, and enter a judgment providing that plaintiff have and take nothing of these defendants.   A judgment consistent with these findings and decision is entered simultaneously herewith.

Signed: August 29, 2007

Dennis L. Howell
United States Magistrate Judge

---

[5]     The court will not take up the claims of immunity asserted by Watauga County inasmuch as it appears that none of plaintiff's claims are viable.